COURT OF APPEALS OF VIRGINIA

Present: Judges Baker, Fitzpatrick and Annunziata
Argued at Alexandria, Virginia


SANTO SHEFFEY-BEY
                                          MEMORANDUM OPINION[*]
v.   Record No. 0192-97-4      BY JUDGE JOHANNA L. FITZPATRICK
                                          OCTOBER 28, 1997
ARLINGTON DEPARTMENT
 OF HUMAN SERVICES


            FROM THE CIRCUIT COURT OF ARLINGTON COUNTY
                    Richard J. Jamborsky, Judge

         Robert J. Hill for appellant.

         Mary E. Craig, Assistant County Attorney
         (Barbara S. Drake, County Attorney, on
         brief), for appellee.



     Santo Sheffey-Bey (father) appeals from an order terminating

his parental rights to his two minor children pursuant to

Code § 16.1-283.  Father contends that the trial court erred in

finding that he had, without good cause, failed to substantially

remedy the conditions which led to the children's foster care

placement.  Finding no error, we affirm.

     On appeal, we review the evidence in the light most

favorable to the prevailing party below, in this case the

Arlington Department of Human Services.  Schoenwetter v.

Schoenwetter, 8 Va. App. 601, 605, 383 S.E.2d 28, 30 (1989).

Where the record contains credible evidence in support of the

findings made by the trial court, we may not retry the facts or

substitute our view of the facts.  See id.

_____
        [*]Pursuant to Code § 17-116.010 this opinion is not
designated for publication.

Santo Sheffey-Bey is the natural father and Sharon Sheffey (mother) is the natural mother of Savannah Sheffey (D.O.B. 8-26-90) and Samone Sheffey (D.O.B. 2-28-92). During the course of the parties' relationship, which began before the birth of the two children who are the subjects of these petitions, there were five "founded" cases of child abuse against mother. Additionally, mother was hospitalized on several occasions due to injuries resulting from physical altercations between herself and father. Father was incarcerated at least three times for various offenses, including drug-related charges.

In April 1992, while father was incarcerated, mother moved to a "crack house" with Samone and Savannah and their three older half-siblings. Upon learning where his wife and daughters were living, the father notified Pro-Child of their living conditions and on June 19, 1992, all five children were removed and placed into foster care by the Arlington Department of Human Services (DHS). Savannah and Samone were then placed in the foster home of Charmaine Grant, where they have remained.

DHS had provided services for the family since 1988 and continued to offer multiple services in an attempt to prevent the removal of the children. These services included day care, mental health referrals, substance abuse referrals, transportation, clothing, food, parenting and budgeting counseling, housing, and emotional support. Despite these efforts, the parents were unable or unwilling to remedy the

2

conditions which resulted in the children's foster care placement.

DHS's initial sixty-day foster care service plan, dated August 1992, indicated the program goal to be "return home," and set December 1992 as the target date for achieving this goal. The report detailed several necessary steps for the parents to take before the children could be returned to them. The children remained in foster care for the next three years, while the parents continued to receive substantial opportunities for assistance.

During that period, father was arrested for assaulting mother; mother remained unable to maintain independent living or to remove herself from the violent relationship with father; father failed to secure permanent employment or to curb his abusive behavior; and father remained unable or unwilling to refrain from substance abuse or to comply with proffered treatment services. Neither parent cooperated or adequately complied with the services offered by DHS. Thus, in February 1995, the foster care service plan goal was changed to "adoption," and in March 1995, DHS filed petitions for the termination of both parents' rights.[1] On October 21, 1996,

---

[1]The petitions for the termination of parental rights to both Savannah and Samone state, in pertinent part, as follows:

> The parental rights of the child's mother and father require termination in that, . . . both natural parents, without good cause, have been unwilling or unable to remedy substantially the conditions which led to the

3

mother voluntarily entered into permanent entrustment agreements relinquishing custody of the children to DHS for adoptive placement.

An _ore_ _tenus_ hearing regarding the termination of the father's residual parental rights was held October 21-23, 1996. Several expert witnesses testified about their work with father and the children. Victor Elion, Ph.D., a licensed clinical psychologist, testified that pursuant to the request of DHS, he conducted an evaluation of father's psychological characteristics and functions. He found that father had a longstanding substance abuse problem and a history of "beating [the mother] up." He characterized father as having "schizo-affective disorder, bipolar type" as well as "intermittent explosive disorder" and "paranoid personality disorder." A person who has intermittent explosive disorder "is inclined to erupt into explosive and violent episodes on slight provocation." Dr. Elion concluded that

> Mr. Sheffey was not an ideal candidate for treatment and, indeed, if he were to participate, it would only be because he was pressured into it, and even then he would

> child's foster care placement or to make reasonable progress towards the elimination of said conditions notwithstanding the reasonable and appropriate efforts of ACBSS/DHS to such end, having failed to comply with the original foster care plan furnished to them, filed, and approved by the Court on or about 8/16/92; therefore, ACBSS/DHS requests that the parental rights of Mrs. Sharon Arnetta Sheffey and Mr. Santo Ortez Sheffey be terminated.

4

likely be argumentative, resistant and not seeing the services of any potential benefit to him.

William Davis, an expert substance abuse counselor, testified that in 1994 he began providing services to father "with the hope that he could become stable and free from substance abuse and improve his life." Mr. Davis continued to counsel father through October 1995, when father was incarcerated again and Davis was not permitted to visit him in jail.

At the conclusion of the hearing, the trial court found that

Mr. Sheffey-Bey lacks insight . . . he makes excuses. He rationalizes . . . .

Now, I find that the County has proved by clear and convincing evidence that Mr. Sheffey-Bey had neglected or abused the two children and that as a result . . . there was a serious and substantial threat to their life, health or development.

And this is what I think he did. First of all, I think that his temper in the domestic violence clearly is a form of abuse for those children . . . .

There is testimony that this mother had several scars on her face as a result of [the father's abuse].

And it's inconceivable to me that those children are not perceptive enough to see that their mother has these scars. I'm sure they discussed how the scars got there.

So even for the sake of argument, though this is not a finding of fact, even if those children were not present in every instance of physical abuse, I still conclude that that kind of conduct and its results on the mother have an impact on the child.

I also conclude that there is neglect with respect to his own drug and alcohol involvement. And I conclude that there was abuse and neglect with respect to his frequent jail trips.

The evidence is that there were 11 convictions in 17 years . . . .

And I would never for a moment conclude

5

that someone is an unfit parent or has abused or neglected the children just because they're in jail or in prison, but that's not the situation here.

This is a situation where someone by all objective looks -- I don't believe this about him, but by objective looks at the record is a career criminal with 11 convictions in 17 years.

And the fact that he's not around those children meant that one of those children went through the most hideous, despicable forms of abuse that I can possibly imagine.

And . . . there is no doubt in my mind that Savannah was sexually abused by someone. And I don't think that it was Mr. Sheffey-Bey. But the fact that he wasn't there as the parent because of choices that he made is definitely a form of neglect. And it wasn't on just one occasion.

I indicated that I think Mr. Sheffey-Bey had lack of insight. And it leads me to the other form of neglect . . . .

[H]e was telling me in his direct testimony that he made up to $1,500 a week or month or whatever it was, I asked him if he paid child support. And his response to that question was, quote, no one asked me to pay. . . .

That, too, is a form of neglect.

Now, these things individually, standing alone may not be sufficient; but when you take all of these factors together, that is clear and convincing and overwhelming evidence of neglect.

I further find that the testimony -- that the evidence by clear and convincing evidence shows that Mr. Sheffey-Bey without good cause has not responded to or followed through with the appropriate, available and reasonable rehabilitative efforts on the part of social medical and mental health or other rehabilitation agencies designed to reduce, eliminate or prevent the neglect or abuse of the children.

I think that the testimony is overwhelming on that point . . . .

And I think that the children's therapist was a very, very persuasive witness. And I put great weight in her testimony in considering what's to be done.

6

So with that analysis I'm of the opinion that Mr. Sheffey-Bey's parental rights should be terminated. And it will be so ordered.

On December 21, 1996, the trial court issued its order and made the following findings, based upon clear and convincing evidence, regarding the father's residual parental rights:

1. The neglect and/or abuse suffered by Savannah and Samone Sheffey presented a serious and substantial threat to their life, health and development; and that

2. It is not reasonably likely that the conditions which resulted in such neglect and abuse can be substantially corrected or eliminated so as to allow the children's safe return to Santo Sheffey within a reasonable period of time; and that

3. The father has without good cause been unwilling or unable within a reasonable period not to exceed twelve months to remedy substantially the conditions which lead [sic] to the children's foster care placement, notwithstanding the reasonable and appropriate efforts of the Arlington Department of Human Services to such end.

Accordingly, the court terminated the father's residual parental rights.

The record established at the hearing clearly supports the trial judge's determination that it was in the best interests of the children that father's residual parental rights be terminated. Code § 16.1-283(C)(2) provides, in pertinent part, that

[t]he residual parental rights of a parent . . . of a child placed in foster care . . . may be terminated if the court finds, based upon clear and convincing evidence, that it

7

> is in the best interests of the child and
> that . . . [t]he parent . . . without good
> cause [has] been unwilling or unable . . . to
> remedy substantially the conditions which led
> to the child's foster care placement.

See also Lecky v. Reed, 20 Va. App. 306, 456 S.E.2d 538 (1995).
Father had ample time from 1992 until 1995 to utilize the
numerous services made available to him to correct his drug use
and abusive conduct and to follow through on the various
therapies offered to him to deal with his psychological problems.
He failed to do so. Additionally, the children's special needs
occasioned by the actions of both father and mother were being
met by their foster mother.

For the above stated reasons, the judgment of the trial
court is affirmed.

Affirmed.