COURT OF APPEALS OF VIRGINIA


Present:  Judges Bray, Annunziata and Overton


ANITA SEIDL
                                        MEMORANDUM OPINION[*]
v.    Record No. 0711-97-2                 PER CURIAM
                                        NOVEMBER 10, 1997
DEPARTMENT OF SOCIAL SERVICES
 OF HENRICO COUNTY


            FROM THE CIRCUIT COURT OF HENRICO COUNTY
                    L. A. Harris, Jr., Judge

          (John M. Wright, Jr.; Downs and Wright, on
          brief), for appellant.

          (George T. Elmore, III, Assistant County
          Attorney, on brief), for appellee.

          (Deborah S. Tinsley, guardian ad litem for
          infant child.)


     Anita Seidl appeals the decision of the circuit court

terminating her residual parental rights to her child.  Seidl

contends that trial court erred in finding that the Henrico

County Department of Social Services (DSS) established by clear

and convincing evidence the criteria set out in Code § 16.1-283.

 Upon reviewing the record and briefs of the parties, we conclude

that this appeal is without merit.  Accordingly, we summarily

affirm the decision of the trial court.  See Rule 5A:27.

     "The termination of parental rights is a grave, drastic,

and irreversible action."  Lowe v. Department of Pub. Welfare,

231 Va. 277, 280-81, 343 S.E.2d 70, 72 (1986).  "'[S]tatutes

_____

     [*]Pursuant to Code § 17-116.010 this opinion is not
designated for publication.

terminating the legal relationship between parent and child should be interpreted consistently with the governmental objective of preserving, when possible, the parent-child relationship.'" Id. (Citation omitted). But,

> [w]hen addressing matters concerning a child, including the termination of a parent's residual parental rights, the paramount consideration of a trial court is the child's best interests. On review, "[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests."

Logan v. Fairfax County Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 463 (1991) (citation omitted). "The trial court's judgment, 'when based on evidence heard ore tenus, will not be disturbed on appeal unless plainly wrong or without evidence to support it'" Id. (Citation omitted).

Although Seidl alleges that DSS sought to terminate her parental rights pursuant to Code § 16.1-283(B), the record demonstrates that it relied upon Code § 16.1-283(C). That provision provides, in pertinent part, as follows:

> The residual parental rights of a parent or parents of a child placed in foster care as a result of court commitment, an entrustment agreement entered into by the parent or parents or other voluntary relinquishment by the parent or parents may be terminated if the court finds, based upon clear and convincing evidence, that it is in the best interests of the child and that:

> \* \* \* \* \* \* \*

> 2. The parent or parents, without good cause, have been unwilling or unable within a reasonable period not to exceed twelve months

2

> to remedy substantially the conditions which led to the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

Evidence that the parent failed, without good cause, "to make reasonable progress towards the elimination of the conditions which led to the child's foster care placement in accordance with . . . a [jointly designed and agreed upon] foster care plan" is prima facie evidence that the parent was unwilling or unable to substantially remedy the underlying conditions. Code § 16.1-283(C)(3)(b).

DSS became involved with appellant in December 1993 when it received a complaint that the child appeared at day care with a black eye. Seidl allegedly caused the injury. The agency had difficulty locating Seidl and the child, but did not believe the case warranted an emergency removal. However, in the summer of 1994, DSS initiated an emergency removal when the child could not be located and Seidl refused to disclose his whereabouts.

The evidence presented by DSS indicated that, from the initial contact with DSS, Seidl was uncooperative, angry, and distrustful. She was verbally abusive towards DSS employees and others, and made derogatory comments even in front of the child. The extent of Seidl's distrust and anger was apparent in her trial testimony, where she indicated that she believed numerous witnesses for DSS lied.

Seidl refused to assist in the development of the foster

3

care plan. Under the plan developed by DSS and approved by the court, Seidl was to take a parenting class and receive psychological testing. DSS also sought to evaluate her in-home parenting skills. Seidl completed a STEP parenting class and submitted to psychological testing. She also entered into individual counseling. Despite repeated counseling sessions in both individual and group settings, Seidl did not acknowledge any problems with herself or take any responsibility for her child's removal. She continued to blame others for her problems.

While Seidl was willing to work with certain training and mental health professionals, she remained unwilling to cooperate with DSS personnel in any way. In an effort to overcome this problem, DSS arranged for an outside agency to provide in-home parenting services to Seidl. However, Seidl did not cooperate with the new service provider, and the funding for this service was canceled. One year later, in December 1995, Seidl wrote to the service provider and expressed a willingness to cooperate.

DSS believed it was necessary to observe Seidl at home with the child to ensure that the child could be returned to her safely. Neither DSS nor the alternative service provider was ever able to observe Seidl's in-home parenting skills because of her resistance. Seidl's lack of cooperation led DSS to seek to terminate her parental rights.

The evidence demonstrated that a return to Seidl's care was not in the child's best interests. The child came into foster

care with emotional and psychological problems. Evidence of those problems belied Seidl's testimony that the child's only problem was that he was anxious after being taken from her abruptly and placed elsewhere without familiar toys or clothes. When the child came into foster care, he was angry, hypervigilant, and insecure. When stressed, the child acted out. His therapist testified that the child did not feel that he could trust Seidl and did not feel safe with her. The therapist indicated that "[t]here was clearly a pattern, chaotic, unpredictable way of living, or caretaking for him that affected him, that continued to affect him today."

At the time of trial, the child had improved. He was calmer, was able to talk about his feelings, and was able to turn to his caretakers to seek relief when stressed. His therapist testified, however, that he "still has emotional behavior problems, that he's going to be troubled with it quite a while into the future," and that he needed a stable home with strong parents. The child expressed clearly that he did not feel safe with Seidl and was frightened by the idea of contact with her. According to the therapist, the continuing uncertainty of where the child would live placed the child at risk for "more anxiety, more difficulty in trusting, more defenses . . . ."

Despite the many services offered to Seidl by DSS, the trial court found that DSS had established, by clear and convincing evidence, that Seidl "failed without good cause to

5

remedy substantially the conditions which led to the child's foster care placement within a reasonable period."  The court also found that the best interests of the child required termination of Seidl's parental rights.  This finding is not plainly wrong or without evidence to support it.

> The statute clearly contemplates that efforts to resolve the "conditions" relevant to termination are constrained by time.  Code § 16.1-283(C)(2).  Absent "good cause," a parent or parents receiving the "reasonable and appropriate" services of "rehabilitative agencies" must "remedy substantially" the "conditions which led to . . . foster care" of the child in a "reasonable period not to exceed twelve months." Id.  This provision protects the family unit and attendant rights of both parents and child, while assuring resolution of the parent/child relationship without interminable delay.  "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming . . . responsibilities."

Lecky v. Reed, 20 Va. App. 306, 312, 456 S.E.2d 538, 540 (1995) (other citations omitted).

Accordingly, the decision of the circuit court is summarily affirmed.

Affirmed.

6