COURT OF APPEALS OF VIRGINIA


Present: Chief Judge Felton, Judges Frank and Petty


GARY EPPS, SR.

MEMORANDUM OPINION[*] BY
v.      Record No. 2803-05-1      CHIEF JUDGE WALTER S. FELTON, JR.
                                  AUGUST 15, 2006
CITY OF NEWPORT NEWS DEPARTMENT
  OF SOCIAL SERVICES


FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
H. Vincent Conway, Jr., Judge

(Marc P. Messier; Stephen A. Dunnigan, P.C., on brief), for
appellant. Appellant submitting on brief.

(Pamela P. Bates, Assistant City Attorney; Sharon Coles-Stewart,
Guardian *ad litem* for the minor child, on brief), for appellee.
Appellee and Guardian *ad litem* submitting on brief.


In October 2005, the trial court entered an order terminating the residual parental rights

of Gary Epps, Sr. ("appellant") to his son, G., pursuant to Code § 16.1-283(C)(2). On appeal, he

contends that the trial court erred in finding the evidence sufficient to terminate his residual

parental rights. For the following reasons, we affirm.

BACKGROUND

On appeal, we view the evidence in the light most favorable to the prevailing party below

and grant to it all reasonable inferences fairly deducible therefrom. Logan v. Fairfax County

Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 462 (1991).

So viewed, the record reflects that G. was born in July 1994 to appellant and Tammy

Epps ("mother"). Appellant and mother were married, lived together, and jointly cared for G.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

until they were evicted from their apartment in 2000, following which G. was in mother's custody. In January 2002, appellant was granted custody of G. following mother's failure to appear at a custody hearing.

In March 2002, the Newport News Department of Social Services ("DSS") filed a Child in Need of Services ("CHINS") petition because "both of [G.'s] parents were mentally retarded and he was previously neglected while in the custody of his father." At that time, the juvenile and domestic relations district court ("district court") ordered that G. be placed in the mother's custody and, in April 2002, ordered a "home study." In May 2002, appellant received a "founded Level-3-CPS complaint regarding physical neglect" for leaving G. in the care of "nonresponsible caretakers" during a visitation. In October 2002, the trial court considered the CHINS petition but continued the matter to January 2003 after noting the previously ordered "parenting capacity evaluations" were incomplete. At the January 2003 hearing, appellant again sought custody of G.

In February 2003, DSS referred appellant to a clinical psychologist, Dr. John Mason, for parenting assessment. He administered "several measures of personality in parenting competence" tests, an IQ test, and "a measure of adaptive function." Appellant's IQ was found to be "within the mildly mentally-retarded range," and his functional abilities were "in the low range."

At the March 2003 custody hearing, a family stabilization worker observed that G. "appeared dirty" at school, noted concerns about an "aunt hitting [G.]," and found trash on the floor of the home during an unscheduled visit. At that time, G.'s guardian *ad litem* recommended that he be placed in foster care. Thereafter, G. was placed in a "therapeutic foster home" at the age of eight years old.

The initial April 2003 foster care plan, prepared by social worker Cassandra James ("James"), stated a goal of "return to own home" with either parent. Under the terms of the foster care plan, appellant was required to follow the recommendations of the parenting assessment, which included a psychosexual evaluation, supervised visitation, ongoing psychological services, a psychological assessment, continued case management services, and cooperation with DSS. He was also given referrals to "father parenting classes" and other case management services.

In May 2003, G. began psychological counseling with Dr. Daniel Walters following his release from a psychiatric hospital, where he had been admitted for "depression and suicidal ideation." At the outset of treatment, G. had "unsuccessful attempts at foster homes." He was not attending school because he was "considered a danger to other people in the school setting." Dr. Walters also diagnosed G. with attention deficit disorder.

Appellant was scheduled to have bi-monthly visitation with G., but he did not appear for his first visitation until August 2003. During that visit, appellant "questioned [G.] about the price of the shoes that he was wearing and who bought cheap shoes for him." James, who observed the visitation, "interrupted the visit to put [appellant] out and explained to him that the purpose of the visit was to spend time with [G.]." He then interacted and played with G. In September 2003, appellant had "an appropriate visit" with G. At an October 2003 visit, however, appellant "spent the visit sitting in a chair playing with his cell phone." After that visit, James discussed with appellant the father parenting class, psychosexual exam, and the appropriate contact information. James notified appellant of a scheduled follow-up visitation and other changes to his visitation schedule via telephone and certified mail. Nonetheless, appellant missed scheduled visitations in November and December 2003.

In January 2004, appellant attended a scheduled visitation with G. and met with his case manager. He subsequently informed DSS that he did not need case management services and did not want to take any recommended medications.

On January 28, 2004, Dr. Mason evaluated appellant while he interacted with G. during a visitation. Appellant initially indicated to Dr. Mason that he was "refusing services through the clinic because he didn't want to follow through with the recommendations." Dr. Mason observed that appellant "was not sensitive to [G.'s] desire to interact with his dad." Appellant also "acknowledged that he had learning problems . . . describ[ing] himself as slow, mentally retarded," but then contradicted himself by stating that he was "class valedictorian, spokesman for the school, and made a statement that . . . he had written a song and sold [it] to Michael Jackson."

Dr. Mason noted appellant's history of stealing from his employers and his "possible history of sexual acting out with younger children." Based on this parent/child assessment, he recommended against returning G. to appellant's custody at that time, opining that appellant did not have the capacity to parent G. "without a great deal of support and assistance and cooperation with services." He recommended that supervised visitation continue and that appellant attend parenting classes, noting that "[a]ll recommendations from [the] . . . psychological evaluation should be completed before reunification is considered."

In March 2004, the goal of the foster care plan was amended from "return to own home" to "adoption." James noted that the goal was changed "because neither parent at the time had successfully completed the recommended services . . . such as the psychosexual and . . . psychological evaluation." She noted "concerns with the parents' ability to appropriately care for their child." James also noted that appellant needed case management services due to his psychological history and inability to care for himself.

In August 2004, social worker Mignon Jones ("Jones") assumed case management of G. Jones observed that appellant had not maintained stable housing or employment, had not received any psychiatric services, and had not completed parenting classes. In December 2004, DSS filed a petition in the district court to terminate appellant's residual parental rights.

In June 2005, G. was moved to a foster home offering the possibility of adoption. The prospective adoptive parent allowed G. to continue visitation with his mother. However, Dr. Walters and DSS recommended against continued visitation with appellant because he tended to "have the child behave in inappropriate ways when it comes to following directions." In the adoptive home, G. was "doing fairly well" and "his affect ha[d] changed."

In August 2005, the district court granted the DSS petition to terminate appellant's parental rights. Appellant appealed to the circuit court, and a termination hearing was held there in October 2005.

The circuit court ordered that appellant's residual parental rights be terminated pursuant to Code § 16.1-283(C)(2), noting that G. "is growing and needs lots of support" and that appellant "will not . . . be able to be a significant factor in supporting this child." It concluded that G. "need[s] to get . . . some permanency, some stability."

ANALYSIS

Appellant contends that the circuit court erred in terminating his residual parental rights to G. under Code § 16.1-283(C)(2) because 1) DSS failed to present clear and convincing evidence that he failed to substantially remedy the conditions which led to G.'s foster care placement; and 2) DSS failed to prove that termination was in G.'s best interests.

The residual parental rights of a parent may be terminated if the court finds, based on clear and convincing evidence, that:

> [t]he parent or parents, without good cause, have been unwilling or
> unable within a reasonable period of time not to exceed twelve

months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

Code § 16.1-283(C)(2). That provision "protects the family unit and attendant rights of both parents and child, while assuring resolution of the parent/child relationship without interminable delay." Lecky v. Reed, 20 Va. App. 306, 312, 456 S.E.2d 538, 540 (1995) (citations omitted). As we have often stated, "[t]he termination of [residual] parental rights is a grave, drastic and irreversible action." Helen W. v. Fairfax County Dep't of Human Dev., 12 Va. App. 877, 883, 407 S.E.2d 25, 28-28 (1991) (citations omitted). However, "[i]t is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his responsibilities." Kaywood v. Halifax County Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990). "When reviewing a decision to terminate parental rights, we presume the circuit court thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests." Toms v. Hanover Dept. of Social Services, 46 Va. App. 257, 265-66, 616 S.E.2d 765, 769 (2005) (citations omitted). In its capacity as fact finder, therefore, the trial court retains "broad discretion in making the decisions necessary to guard and to foster a child's best interests." Id. at 266, 616 S.E.2d at 769 (citations omitted). In determining what is in the best interests of a child, we have stated:

a court must evaluate and consider many factors, including the age and physical and mental condition of the child or children; the age and physical and mental condition of the parents; the relationship existing between each parent and each child; the needs of the child or children; the role which each parent has played, and will play in the future, in the upbringing and care of the child or children; and such other factors as are necessary in determining the best interests of the child or children.

Barkey v. Commonwealth, 2 Va. App. 662, 668, 347 S.E.2d 188, 191 (1986).

From the record before us, we conclude that there was clear and convincing evidence that termination of appellant's parental rights was in G.'s best interest. At the time of the October 2005 termination hearing, appellant had not maintained stable housing or employment, had not received any recommended psychiatric treatment, had not completed parenting classes, and had not maintained regularly scheduled visitation with G., all requirements of the April 2003 and March 2004 foster care plans. Moreover, appellant's periodic interaction with his son often caused G. to "behave in inappropriate ways."

Appellant was "mildly mentally-retarded" and unable to care for G. "without a great deal of support and assistance and cooperation with services," services that appellant was offered but refused. During his psychological assessments, Dr. Mason's "greatest concern was [appellant's] relative weakness in the areas of health, safety and social adjustment." He noted that these areas are "very important with regard to child rearing and could have . . . had a negative impact on his ability to provide a wholesome and stable environment for his son." Dr. Mason also found the personality and emotional section of appellant's psychological assessment to be "very significant," finding a "pattern of long-term characterological problems that suggest[ed] difficulty concentrating, thinking clearly, and having very poor judgment," and a high likelihood he would "become disorganized, agitated, or may withdraw when [he] become[s] emotionally upset." Furthermore, appellant conceded at the termination hearing that there had been "no significant change" in his circumstances related to the requirements of the foster care plan during the preceding twelve months.

At the time of the October 2005 termination hearing, G. was eleven years old and his condition had improved to the point where he was attending school in a program for emotionally disturbed children, and "was able to do pretty well." He "attended classes . . . got fairly decent grades" and was "a lot better than he was at the point [Dr. Walters] started with him when he was

considered too dangerous to be in school, and even a year ago, [when] he was still overturning furniture and things like that in school, which he has not done in a long time now, in a full year."

We conclude that the trial court did not err in finding the evidence sufficient to support a termination of appellant's residual parental rights to G. because of his inability to "substantially remedy the conditions which led to or required continuation of [G.'s] foster care placement" within a reasonable period of time.  Code § 16.1-283(C)(2).

CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment terminating appellant's residual parental rights to G.

Affirmed.